MABEL EVANS, Appellee, v. MUSCATINE BRIDGE CORPORATION, Appellant.

No. 44921.

AUGUST 6, 1940.

Drake & Kautz and Hanley & Hanley, for appellee.

Lane & Waterman, for appellant.

STIGER, J.—Plaintiff's specifications of negligence are: (1) The roadway on defendant's bridge was composed of an asphalt covering and when plaintiff received her injuries the roadway was in a highly slippery and dangerous condition of which defendant had knowledge and had taken no means to over-

come the dangerous condition. (2) Defendant failed to warn plaintiff of the dangerous and slippery condition of the roadway.

Plaintiff alleged she did not know definitely what caused the slippery condition of the roadway.

Defendant owns and operates a toll bridge running north and south over the Mississippi river, the south end resting on the Illinois shore. The tollhouse is at the north end of the bridge near the Iowa shore. The bridge is 2,660 feet long. The Iowa entrance is on Walnut Street in Muscatine. Commencing at the tollhouse on the Iowa side, the roadway, 17 feet wide, ascends at a 4.7 percent grade for 957 feet, is level for about 400 feet and then descends at a 4.7 percent grade 1,000 feet to the Illinois side. On each side of the roadway there is a curb 8 inches high. On the west, or downstream side of the bridge, there is a pedestrian's walk 4 feet wide between the west curb and the railing which is built of 4 x 4 posts, on top of which is a 2 x 6 running lengthwise, and three 1 x 6 boards along its face.

In the summer of 1937 the floor of the roadway was surfaced with an asphalt composition designated as asphalt plank made by Phillips-Carey Company. Each plank is 1 inch thick and 6 inches wide and is applied by nailing and cementing it to the wooden floorboards of the bridge. The plank is prepared by a patented process, the asphalt being mixed with felt. The function of the felt is to absorb excess oil. Plaintiff was familiar with the general structure of the bridge for several years prior to the accident at which time she lived in Illinois. For 2 weeks prior to the accident on September 8, 1937, plaintiff worked in Muscatine, driving over the bridge twice daily. On September 8th she left her home about 5:45 in the morning, reaching the bridge about 6:15. The bridge was wet from a heavy dew or vapor from the river or from both causes. After plaintiff had reached the descent to the Iowa side she states she was driving at 10 miles per hour and applied her brakes about 100 feet south of the tollhouse where

she intended to stop. Immediately after applying her brakes she lost control of her car which skidded, according to her testimony, at approximately right angles to the roadway. some distance then went over the west curb, over the walk, through the rail and plunged to the street. She experienced no difficulty on her journey over the bridge until she applied her brakes.

Defendant introduced evidence that the car commenced to skid about 200 feet south of the tollhouse and that the skid marks extended 60 feet south by measurement from the place where the car left the bridge which was south of the tollhouse.

Witnesses who observed the accident testified plaintiff was driving from 35 to 40 miles per hour.

I. Defendant's assignment of error is that the trial court erred in overruling its motion for a directed verdict, the grounds thereof being (1) plaintiff failed to establish any negligence of defendant; (2) plaintiff was guilty of contributory negligence as a matter of law.

We will consider defendant's first ground for reversal. The general rule is that a bridge company is not a common carrier and is answerable in damages only for failure to exercise ordinary care. The bridge must be kept in a reasonably safe condition for travel. 11 C. J. S. 1105; 8 Am. Jur. 978; 1 Elliott on Roads and Streets (1926 Ed.) Sec. 47; Hendricks v. Covington, etc. Bridge Company, 224 Ky. 592, 6 S. W. 2d 1050; Gibler v. Terminal R. Assn., 203 Mo. 208, 101 S. W. 37, 11 Ann. Cas. 1194; Medema v. Hines, 273 Fed. 52; Dardanelle Pontoon Bridge & T. Co. v. Croom, 95 Ark. 284, 129 S. W. 280, 30 L. R. A., N. S., 360

If there is any negligence on the part of the defendant it is in respect to the use of asphalt plank in surfacing the roadway. The only information about the asphalt plank used on the bridge is furnished by defendant and we will refer to some of its evidence.

C. M. Stanley, a consulting engineer, testified:

"I had general charge of designing and preparing the

plans and specifications and general supervision over the work. The bridge company acted on my recommendation in using the asphalt plank on the bridge floor. Before making that recommendation I made an investigation of the plank as to its non-skid and other qualities. I made a careful check of different types of flooring on which bids had been submitted and tested 4 or 5 different kinds of flooring. We delayed authorization of any contract with anyone for several months while we were checking. That particular type of flooring is one manufactured for use on bridges such as the one owned by the defendant. My investigation showed that such flooring is in general use on bridges.''

C. H. Young, president of defendant company, is an engineer and was formerly at the head of the department of railroad engineering at Iowa State College. As city engineer for Muscatine he became familiar with the various types of pavement and road surfacing. He testified:

''Beginning about in December, 1936 the bridge was remodeled. I participated in selecting the type of floor material to be used on the bridge. I inspected and investigated the bridge floors of the Dubuque, Clinton and Keokuk bridges and also of some bridges in Chicago. After investigation to determine the suitability of asphalt plank for surfacing bridge floors, I selected and designated Carey Bros. plank for use on the bridge.

''There is a difference between asphalt and the product known as asphalt plank. The plank is prepared by a patented process whereas asphalt is prepared by mixing it with a flux oil and usually some sand. In asphalt plank the asphalt is mixed with felt, the purpose being to have the felt absorb any excess oil and make the product uniform. Such planks are usually manufactured by secret trade formulas. In conducting our investigations before deciding on the type of flooring, I thoroughly investigated Carey Bros. plank. I found it was in use on the Dubuque and other bridges. I looked into its non-skid qualities as compared with other types of

surfacing. I secured Professor Morey's report and he is one of the best experts in the United States on skidding. His report shows that asphalt plank is not as slippery as concrete. I observed the plank in use on various bridges and talked with various bridge owners about it in places where the grade was as steep or steeper than the slope on our bridge. After the plank was on our bridge I drove across the new floor on an average of 2 to 6 times per week. I was watching the action of the plank as we have a guarantee on it from the paving company. At no time did it give off oil. I inspected it closely as I wanted to see how it performed.

"According to tests that have been made by experts, asphalt is not as slippery as concrete. There is no practical way in the operation of the High Bridge by which one can prevent dew or other vapor from settling on the structure."

On cross-examination he further stated:

"Traffic on the bridge would not tend to make oil form on the surface of the plank because that product has felt in it and the felt absorbs whatever oil may be there. Traffic merely tends to make asphalt become more pliable."

Plaintiff did not undertake to prove the above evidence was inaccurate.

We will now refer to plaintiff's testimony.

"I knew the roadway of the bridge was wet. It appeared slick, by slick I mean wet. When I reached the bridge I slowed down to 12 miles per hour. As I came on over the bridge it looked wetter on the Iowa side and I slowed down to 10 miles an hour. I put on my brakes when I was about 100 feet from the tollhouse. I applied my brakes on to it quite easy, and I slipped and released it and tried to straighten the car up, but it had skidded in such a condition that it was impossible for me to straighten it up. It had got beyond my control to do anything with it. It skidded over against a little 2 x 6, or 6 x 6, and then on up against the railing, hit the

railing kind of sidewise. By that time I had the car almost stopped but the weight of the car was leaning against the railing, the body of it, and it would not hold it, it wasn't strong enough, and simply cracked and rolled me and the car down on the street.''

On cross-examination:

''I applied my brakes to slow down the car and it went into a skid, and I released the brakes a trifle and tried to straighten the car up, but it had skidded so it was impossible for me to straighten it up. It was beyond my control. When I put the brake on, the car started to skid. I then released it enough to try to straighten the car up. I released it in part. By that time it was in such a skid it was out of control. The car never straightened up out of the skid. It turned around so that it was partly crosswise of the bridge and started to the west side of the bridge. When it started to skid, I was on the upstream (east) side of the roadway. The car went across the bridge to the downstream railing. I had stopped at the tollhouse and knew it was there.''

Ray Foster, a witness for plaintiff, testified that he traveled over the bridge almost every day and when he crossed the bridge on the morning of September 8th it was wet; that he had crossed the bridge on other occasions when the roadway was wet with fog or dew; that moisture made the roadway slippery and he always came down the incline as slowly as he could. On cross-examination the witness testified:

''In coming down the grade if I applied my brakes properly I never had any trouble. When the floor was wet I realized I had to travel slowly and I had no difficulty. The floor of the bridge is no different from any other asphalt paving when wet. It is slippery to the same extent as any asphalt. When I referred to it as being slippery, what I had in mind is the condition of asphalt pavement under the same circumstances. I know many streets are paved with asphalt. In some cases

I have seen sand or gravel placed on asphalt streets especially in winter time. I have never had any experience in seeing sand or gravel on asphalt plank. I have never seen a street paved with asphalt or a bridge with an asphalt plank floor that had sand and gravel on it after it became moist from rain, etc. In using the bridge I always knew that I had to stop and pay toll at the tollhouse.''

Other witnesses testifying for plaintiff stated that they drove over the bridge the morning of September 8th while it was wet and their cars did not slip or skid.

Mr. Hoffman, who collected tolls for defendant, testified:

''Throughout the time I have worked at the tollhouse [2 years] I have never known any automobile driver approaching it to be unable to control his car when the roadway was moist. I have never known of any driver who while descending the incline ran over the downstream curbing and through the railing excepting the plaintiff. I remember Mrs. Evans driving over the bridge on other occasions and particularly in the two weeks or so before the accident, when the floor was wet. At no time did she ever make any complaint about the condition of the floor.''

Mr. Fryberger, superintendent of the bridge, testified for defendant:

''I was working at the bridge when the new flooring was laid and have been there since. At no time did the flooring give off a film of oil or any similar substance. I am on the bridge at various hours throughout the day and evening. I have been there frequently when it was wet from dew and rain. I have never known of any automobile, other than plaintiff's, skidding on the floor. When the bridge floor is wet, its condition is the same as any other surface. After the floor was laid I experimented with the use of sand on the bridge and found that if sand was placed on the floor when it was wet, it caused cars to skid. When there is ice on the bridge we use salt to melt it. At all times, both on and before September 8,

818

1937, there were signs posted at the bridge. There was one at each end, which read, slow, bridge—speed limit 20 miles per hour. The signs were at the right-hand side as a person reached the bridge.''

The substance of plaintiff's evidence is that the roadway was slippery because it was wet. Plaintiff does not claim the surface was slippery because it was oily, that is, the alleged dangerous defect is that the bridge floor was wet. The uncontroverted evidence shows that the roadway was not oily, that wet asphalt plank is less slippery than wet asphalt because of the felt used in its composition and that asphalt surface is less slippery than concrete pavement. So far as shown by the evidence, the roadway was as safe to travel on as an asphalt or cement highway. The roadway was not slippery when dry and plaintiff was aware of the only condition that made it dangerous, that is, she knew it was wet. It was her duty to drive her car with the care commensurate with the inherent danger of a wet, hard-surfaced road and this, as hereinafter stated, she failed to do.

The evidence discloses no defects in the construction or maintenance of the roadway and on this record we are compelled to hold the defendant performed its duty to keep the bridge in a reasonably safe condition for travel.

Under the most favorable view of the evidence rule there was not sufficient evidence to warrant the submission of negligence of the defendant to the jury and the case must be reversed.

II. We are also of the opinion that the proximate cause of plaintiff's injuries was her negligent operation of her car. However, because of our disposition of the case, it is unnecessary for us to discuss this issue.—Reversed.

RICHARDS, C. J., and HAMILTON, MILLER, SAGER, HALE, MITCHELL, and BLISS, JJ., concur.